IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:10-CV-58-BO

| | |
|---|---|
| THOMAS H. MILLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )　　ORDER |
| | ) |
| UNION SECURITY INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

This matter is before the Court on both Plaintiff's and Defendant's Motion for Summary

Judgment. (DE ## 17, 19). Plaintiff's Motion for Summary Judgment is GRANTED and

Defendant's Motion is DENIED.

## FACTS

Plaintiff sues under the Employee Retirement Income Security Act (ERISA), seeking

health insurance benefits through the long term disability plan he has with Defendant. (the

"Plan.") It is undisputed that ERISA governs the Plan at issue.

Plaintiff claims disability for cervical disc disease with radiculopathy to the left arm. At

the time of onset, his age was approximately 45 years old. (DE # 408). Also at the time of the

onset, Plaintiff worked as an engineer for Babington Technology LLC, which is a company that

repairs and manufactures machines.

Defendant initially found Plaintiff disabled under his short term disability plan.

Defendant then denied long term disability benefits, finding that Plaintiff's disability was pre-

existing under the long term disability Plan. After an appeal, Defendant determined that Plaintiff

condition was not pre-existing; however, Defendant then denied the claim, finding Plaintiff was

not disabled.

Plaintiff claims this denial was wrongful under 29 U.S.C. § 1132(a)(1)(B) of ERISA.

### Plan's Text

The Plan defines "disability" as the following

> *Disabled* or *Disability* means that in a particular month, you satisfy…the Occupation Test…, as described below:
> Occupation Test
> - during the first 24 months of a period of disability (including the qualifying period), an injury, sickness, or pregnancy requires that you be under the regular care and attendance of a doctor, and prevents you from performing at least one of the material duties of your regular occupation;

(AR 8). The Plan also defines material duty:

> *Material duty or material duties* mean the sets of tasks or skills required generally by employers from those engaged in an *occupation, which cannot be reasonably accommodated.* We will consider one *material duty* of your *regular occupation* to be the ability to work for an employer on *a full-time* basis as defined in the *policy.* However, if a *material duty* of your *regular occupation* is to work more than 40 hours per week, we will consider you able to perform that *material duty* if you have the capacity to work at least 75% of those hours per week. In addition, no duty will be considered a *material duty* of your *regular occupation* if you were not able, as a result of *injury,* sickness, or pregnancy, to perform that duty with reasonable consistency at the time you became a *covered person* or entered that *occupation,* if later.

(AR 10).

Under the Plan, "regular occupation" means the occupation in which the claimant was

working immediately prior to becoming disabled. (AR 11). "Occupation" means a group of jobs

or related jobs "in which a common set of tasks is performed; or which are related in terms of

similar objectives and methodologies, and which may be related in terms of materials, products,

worker actions, or worker characteristics." (AR 10).

One of Plaintiff's primary duties as an engineer is to sit at a computer, and use software to perform mechanical drafting for pieces of equipment. (AR 359). Plaintiff is right-handed. (AR 516).

Plaintiff's Condition

Plaintiff has cervical disc disease with radiculopathy to the left arm. The following outlines the medical history of the cervical disc disease.

On June 28th, 2007 Plaintiff's Orthopedist Dr. J. Bloem performed surgery on Plaintiff for unrelated rotator cuff syndrome. Plaintiff visited Dr. Bloem throughout July 2007 as his condition improved. (AR 677). On August 6, 2007, Dr. Bloem found that Plaintiff "doing beautifully" with a full range of motion of the shoulder and no pain. (AR 678). Dr. Bloem noted that Plaintiff returned to work.

At the end of August, Plaintiff's began to again experience pain. On August 30, 2007, Plaintiff saw Dr. J. Roberts, a pain specialist, regarding neck and shoulder pain. Examination revealed full muscle strength and normal gait. Dr. Roberts gave Plaintiff a steroid injection and a Transcutaneous electrical nerve stimulation (TENS) unit[1] to stimulate his nerves. Dr. Roberts also prescribed the pain killer Celebrex. On September 26, 2007, Plaintiff again saw Dr. Roberts regarding neck and shoulder pain. (AR 711). Dr. Roberts noted that Plaintiff has had three cervical epidural injections, with 60% improvement. The TENS also helped, but did not always relieve the pain. Dr. Roberts noted that "work makes pain and tiredness worse." Dr. Roberts again advised Plaintiff to take Celebrex. (AR 710).

In October 2007, Plaintiff's condition took a turn for the worse. On October 17, Plaintiff visited an emergency room for a 3-4 day history of left-sided neck pain with radiation to the left arm. Plaintiff described the pain as sharp, severe, and at an 8 out of 10 severity. The pain was

---

[1] use of electric current produced by a device to stimulate the nerves for therapeutic purposes.

3

exacerbated by movement. (AR 671). A physical examination revealed tenderness to palpation over the cervical spine and paravertebral muscles. Provocative maneuvers of the left shoulder were negative and Plaintiff's upper extremity muscle strength was normal. A Neck CT showed multiple levels of disk herniation and arthritic changes. (AR 671, 412).

On October 22, 2007, Plaintiff saw Neurosurgeon Dr. Raymond Baule, a physician he had visited previously for his rotator cuff syndrome, to follow up on his left upper extremity symptoms. Motor examination revealed normal bulk, tone and power. (AR 489). Dr. Baule diagnosed Plaintiff with non-traumatic rotator cuff rupture, for which he referred Plaintiff to a chiropractor. Dr. Baule noted that if symptoms persisted, claimant may benefit from EMG followed by a selective cervical nerve block. (AR 489).

On October 24, Plaintiff saw Chiropractor Dr. Hammer for an initial evaluation. Dr. Hammer diagnosed left upper extremity radiculopathy. (AR pp. 667-670).

On October 31, 2007, Plaintiff saw his primary care physician, Dr. Ghanem, for neck pain. Plaintiff reported persistent pain that radiated to the neck, and stated that he felt proximal weakness in the shoulder. (AR 661). On examination, muscle strength was normal except for 4/5 strength during left shoulder abduction. Dr. Ghanem noted mild atrophy on his shoulder muscles. Dr. Ghanem further noted that the claimant's deep tendon reflexes were only 3/5 "all over the left upper extremity." (AR 661). Dr. Ghanem indicated that an MRI of the neck was needed, but deferred that decision to an orthopedist or neurosurgeon. (AR 663).

On November 16, 2007, Plaintiff visited Orthopedist Dr. David Miller for a second opinion regarding his neck and left upper extremity pain. On examination, the Plaintiff walked with a normal gait and posture, with normal heel and toe walk. Range of motion of the cervical spine was essentially normal, without significant pain. Examination of the left upper extremity,

4

however, showed marked atrophy of the musculature of the deltoid, biceps, triceps, supraspinatus, and infraspinatus muscles. Adson's maneuver, a test for thoracic outlet syndrome, was positive. Plaintiff's range of motion of the left shoulder was limited with abduction and external rotation, and was associated with pain. Motor strength for those muscles was only 3/5, as well as for the pectoralis major muscle. (AR 734). The Plaintiff had minimal diminished sensation to light touch on the lateral aspect of the left arm. Deep tendon reflexes were 3/5 for the triceps and only 1/5 for the brachioradialis. Plaintiff scored a 62 percent on the Oswestry Disability Index.[2] (AR 734).

In view of the Plaintiff's significant and continued wasting of the left upper arm and shoulder muscles, as well as the continued neck and upper arm pain, Dr. Miller recommended a CT scan of the neck to rule out residual cord or nerve root compression in the neck. (AR 735). The CT scan was performed a few days later and revealed congenital narrowing of the spinal canal with near complete effacement of the thecal sac at C4-5 and partial effacement of the thecal sac without evidence of cord compression at C5-6. (AR 789). Superimposed degenerative changes were noted throughout the cervical spine with facet joint arthropathy and neural foraminal stenosis at several levels, most severe at C4-5 on the left. Cervical myelogram showed diffuse narrowing of the thecal sac from C3-C5. (AR 789).

At the Plaintiff's next appointment on December 12, 2007, Dr. Miller concluded that the CT scan results did not show "a significant amount of cord compression or nerve root compression" that would explain the wasting in Plaintiff's muscles. (AR 736). Dr. Miller

---

[2] The Oswestry Disability Index is a questionnaire that measures lower back pain. The questionnaire involves the patient's perceived level of disability in 10 everyday activities of daily living A score between 60 to 80 percent falls into the "crippled" category and means the pain impinges on all aspects of these patients' lives—both at home and at work—and positive intervention is required.

referred the Plaintiff to a neurologist for an EMG/nerve conduction study of the left upper extremity to determine the exact source of the nerve deficit causing the muscle atrophy. Id.

On January 10, 2008, Plaintiff saw Neurologist Dr. Robert Frere. (AR 460). Plaintiff had limited range of motion of the cervical spine, especially with flexion and extension. (AR 647). The Plaintiff had decreased range of motion of the left shoulder and atrophy of the left shoulder and atrophy of the upper arm. (AR 648).

On January 10, 2008, Plaintiff saw Neurologist Dr. Robert Frere for further evaluation of his left arm weakness and atrophy. (AR 460). Plaintiff had limited range of motion of the cervical spine, especially with flexion and extension. (AR 647). The Plaintiff had decreased range of motion of the left shoulder and "obvious" atrophy of the left shoulder and atrophy of the upper arm. (AR 648). Dr. Frere concluded that the Plaintiff had a left arm paresis and atrophy involving the C5-6 and C7 root distributions, with a history of cervical spondylosis, stenosis, and right C3-4 anterior cervical discectomy and fusion in 2005. Dr. Frere prescribed Lyrica for the Plaintiff's nerve pain, and referred him for an EMG/nerve conduction study. (AR 649).

Nerve conduction studies later that week showed a chronic, active left C5-6 radiculopathy, as well as a chronic inactive left C8-TI radiculopathy. On February 7, 2008, Plaintiff saw Dr. Frere for a follow up. (AR 461). Plaintiff continued to complain of left arm pain and weakness despite the pain medication Lyrica. Dr. Frere concluded that Plaintiff had left upper arm amyotrophy as well as signs of a cervical myelopathy. Dr. Frere referred the Plaintiff to physical therapy and advised him to increase Lyrica to 150 mg twice a day. (AR 461).

At the initial occupational therapy evaluation on February 20, 2008, Plaintiff reported weakness of the left upper extremity and pain and burning sensation in the neck, shoulder, and left upper extremity down to the finger tips on lateral aspect of his hand. (AR 625). He reported

being unable to use his left arm due to pain. (AR 625). On examination, the Plaintiff was tender at the medial to the scapula border and over the supraspinatus, with atrophy noted at the supraspinatus. (AR 626). His range of motion of the left shoulder was moderately limited in almost all planes. Muscle strength was decreased at 3/5 for his left upper extremity flexion and abduction, and 4/5 for rotation; right upper extremity strength was 5/5. Sensation was intact, but the Plaintiff reported burning over the left lateral forearm. The "empty can test" was positive[3] and consistent with supraspinatus injury. (AR 626). Diagnoses included 1) left upper extremity paresis secondary to CS-6 radiculopathy; 2) painful shoulder 3) decreased range of motion in the cervical spine 4) weakness in the cervical and left shoulder, and 5) weakness in the cervical and right shoulder. Id.

The therapist noted Plaintiff was very motivated to improve his mobility and decrease pain. Id. On March 6, however, Plaintiff called to state that he would not return to physical therapy due to financial constraints. (AR 622). He added that he was performing his home exercise program as instructed. Id.

### Plaintiff Applies for Short Term Disability

Plaintiff applied for short term disability on December 19, 2007, stating that he was unable to work as of October 22, 2007. (AR 142).

In support of Plaintiff's application for benefits, Dr. Frere concluded on December 10 that Plaintiff had a class 5 physical impairment on the basis of neck pain with wasting of the muscles of the upper left arm and pain in the left arm and shoulder. A class five impairment is a severe limitation that renders the impaired incapable of minimal activity or sedentary work. Dr. Frere stated Plaintiff could occasionally sit, stand, walk, drive and bend but could never do data

---

[3] This test involves the integrity of the supraspinatus tendon. The test is considered positive when there was pain, muscle weakness or both.

entry. Dr. Frere added that the Plaintiff would not be able to return to work until cleared by Dr. Miller, the treating orthopedist. (AR 420).

On January 14, 2008, Dr. Frere stated that the Plaintiff was unable to use his left arm and that this restriction was indefinite. (AR 782).

During the time, Defendant's employee also made multiple determinations that Plaintiff was disabled. On January 11, 2008, Defendant's clinical disability special, Registered Nurse Barb Walls, stated that return to work "is unlikely without the use of his left arm due to the progressive nature of the muscle atrophy and the multiple locations of spinal involvement." (AR114). RN Walls concluded "it is reasonable that Mr. Mills is unable to sustain any activities of his job due to the inability to use his left arm for work activity." (AR 114). Four days later, RN Walls completed another assessment of Plaintiff. She noted that "[alt]hough Mr. Mills' job is sedentary, he requires sustained use of both arms to do his work activities." (AR 119). She concluded that Plaintiff "is unable to sustain activities of standing, sitting, data entry, and grasping due to the muscle atrophy and pain." (AR 119). On January 30, 2008, RN Walls completed a third assessment. She concluded that "it is reasonable that Mr. Mills remain off of work until after his next appointment with Dr. Frere on February 7, 2008. He remains unable to sustain activities of standing, sitting, data entry and grasping due to the muscle atrophy and pain." (AR 118).

Defendant approved Plaintiff for short term disability under Plaintiff's short term disability plan, and Defendant issued the first benefit check to Plaintiff on January 8, 2008. (AR 142).

On January 31, 2008, Defendant notified Plaintiff that it needed to review whether Plaintiff's condition was pre-existing under the long term disability Plan. The condition would be pre-existing if it was treated during the three months prior to the Plan's effective date, which ran from February 11, 2007 to April 30, 2007 (AR pp. 312-13).

Meanwhile, Dr. Frere consistently and continuously found Plaintiff disabled. On February 5, Dr. Frere stated that the Plaintiff was unable to use his left arm for any work activity indefinitely. (AR 737). On April 10, 2008, Dr. Frere again indicated that the Plaintiff had a class 5 physical impairment. He also specified that the impairment was unrelated to Plaintiff's previous rotator cuff issues. (AR 495).

On April 24, 2008, the 24 week short term disability period ended, and Defendant stopped sending Plaintiff short term disability checks. Defendant had not yet made a determination regarding pre-existing conditions.

## April 30th Phone Call

On April 30, 2008, a phone conversation occurred that would become the focal point of this lawsuit. Defendant's employee, Sandy Sulton, called Plaintiff to ask about his pharmacy records. Sulton took notes of the conversation. After she received the information she needed, she asked Plaintiff "how he was doing currently?" According to Sulton's notes, Plaintiff stated the following:

> He said about the same. He sees Dr. Frere again on May 7, 2007. He said the doctor said he had some significant nerve damage around C5, C6. I asked what specifically is he unable to do in regard to his job? He said mainly he can't sit or stand for any length of time. He said it takes him 2 days to get his grass mowed. I said so then it is not using your arm doing computer work that is the problem....he said no, it is more the pain from sitting or standing. I asked if he could drive and he stated yes.

(AR 222).

<u>Defendant's first denial: Pre-existing condition</u>

On May 9, 2008 Defendant referred Plaintiff's file for review by Dr. Nina Smith, MD, who completed her review on May 12, 2008. (AR pp. 610-18). Ms. Smith determined that Plaintiff's condition was related to his rotator cuff syndrome and was thus pre-existing.

Subsequently, Defendant's Technical Consultant, Scott Uptgraft, DC III, summarized his assessment of Plaintiff's claim on May 30th. In this summary, he concluded that Plaintiff satisfied the Plan's definition of disability. He wrote, "A review of the file shows that we were in agreement with limitation from all work during the STD [short term disability] period, which ran through 4/24/09." Uptgraft then notes "some sort of disconnect" between the medical evidence and Plaintiff's statements on the phone on April 30th. Uptgraft concluded,

> With that said, without further contact with Dr. Frere and possible [sic] some other testing such as a functional capacity evaluation, we cannot reach a decision on the insured's physical capabilities for work. At this time, without such additional information, we would still consider the insured to remain disabled as per the occupation test.

(AR216). In the "Conclusion" section of the report, Uptgraft wrote "Consider occupation test as still satisfied. Deny as pre-existing." (AR 216).

Subsequently, Defendant sent a denial letter to Plaintiff on the basis of a pre-existing condition June 4, 2008. (AR 594-597).

<u>Review on Appeal</u>

On August 5, 2008, Plaintiff's attorney appealed the determination that Plaintiff's disability was pre-existing. (AR 433-438).

Plaintiff's appeal included a letter from Dr. Baule attempting to clarify the nature of Plaintiff's medical visits from April 2007 to June 2007. (AR 437). The Plaintiff also provided a July 9th letter from Dr. Frere stating the nature of Plaintiff's disability is left arm weakness and

chronic pain from cervical degenerative disease. (AR 438). Dr. Frere further stated that Plaintiff

is "totally disabled at this point because of his significant arm weakness and pain syndrome.

Given the duration of this suspected left arm nerve injury I do not anticipate any major

improvement." Id.

In its briefing, Defendant complains that Plaintiff did not provide adequate information

on the appeal. Specifically allege he provided no response to the following questions on the

appeal form:

1. Tell us why you believe our decision is incorrect. Be specific and complete as possible.
   We will be best able to address your concerns if you describe why you disagree with our
   determination.

2. If benefits were denied because we found you not disabled, indicate the conditions that
   you feel are/were limiting you, and explain to us how these conditions have impacted
   your daily activities. Also describe the activities you are currently able to engage in.

3. Please list the names, addresses and phone numbers of those individuals or organizations
   you believe have evidence that we are unaware of that supports your position, and why.
   (This could include, but is not limited to, physicians, psychologists, psychiatrists,
   physical therapists, hospitals and pharmacies.)

(AR 435). Notably, there would be no reason for the Plaintiff to answer the second question, as

at this point, Defendant had never determined that Plaintiff was not disabled.

On September 3, 2008, Defendant's Consulting Physician Elizabeth Engelhardt reviewed

Plaintiff's file. (AR 408-425). She concluded that Plaintiff's condition was not pre-existing,

finding that while Plaintiff's ailments during the preexisting period were caused by rotator cuff

tendinitis and a glenoid labrum tear, his current condition was caused by the separate problem of

cervical disc disease. (AR 421-422).

Dr. Engelhardt also discussed Plaintiff's limitations:

The medical records provide evidence that the claimant bas been physically limited from
performing work requiring significant use of the left arm since the onset date. His
cervical disc disease with myelopathy has resulted in significant weakness primarily

affecting the neck and left upper arm. Specific physical limitations are somewhat difficult to determine, as in a phone call on *04/30/08,* the claimant stated that it was pain from prolonged sitting or standing, not an inability to perform computer work, that prevented him from working. This is somewhat puzzling, as the claimant has not recently complained of significant lower back or leg pain that would cause difficulty sitting or standing, but rather severe neck and left arm pain. Based on the medical records provided, however, and along with statements from his providers, the claimant would be expected to be physically limited from performing overhead work, reaching, lifting or carrying, pushing or pulling with the left arm, and repetitive work using the left arm; he may use the left forearm for occasional light activities. When not using the left arm, the severity of the claimant's pain is unknown, especially since medical records after February 2008 are not available for review.

(AR 422).

Dr. Engelhardt later states, "[t]he claimant reports being capable of performing computer work with his left hand, however. Although the claimant maintains that he is physically limited from working due to pain from prolonged sitting and standing, these limitations are not supported based on the medical records." (AR 423). This reference to the capabilities of Plaintiff's hand seems to be based entirely on the April 30th phone conversation. Earlier in her report, she acknowledged Plaintiff's reported symptoms of "pain and paresthesias into the left arm and hand." (AR 422).

Dr. Engelhardt did not determine whether Plaintiff was disabled under the Plan's definition, which requires a disease that "and prevents you from performing at least one of the material duties of your regular occupation." Instead, she opined that, "[w]hen not using the left arm, it is likely that the claimant's pain would be controlled sufficiently to enable him to perform some type of work on a full time basis." Id.

Dr. Engelhardt ultimately concluded that more information was necessary to determine whether Plaintiff was disabled. She provided a specific "action plan," recommending "referral to Vocational Services for clarification of the claimant's occupation." She also recommended "obtaining medical records in 4-6 months, with referral back to Clinical Services for evaluation

of ongoing physical limitations," finding that "An FCE [functional capacity evaluation] may be indicated at that time." (AR 423).

Subsequently, Defendant's Rehabilitation Counselor, Karen Sherwood, performed an occupation analysis. In preparation for her analysis, she reviewed the Job Description and Requirements form provided by Mills' employer. (AR 403). Ms. Sherwood also contacted Mills' employer to obtain additional information regarding the duties of his occupation. (AR 363). Ms. Sherwood determined that Plaintiff's job falls into the occupational category of "drafter" despite being called an engineer. (AR pp. 359-60). Ms. Sherwood also determined that Plaintiff's job falls into a sedentary and light category for exertional demands. Id. She describes his duties as the following:

> The claimant sat at a computer, and used software to perform mechanical drafting for pieces of equipment. There was no lifting or carrying involved in his job duties. He might have been required to go into the plant occasionally to perform a measurement, but this would not involve overhead reaching. He performed some sales functions primarily by telephone, and occasionally by visiting a local customer. This was not a significant part of his job. He would obtain information from a customer as to what they were wanting, provide them with a quote for labor and materials, and follow the order to completion. This company repairs equipment as well as fabricates new equipment.

Id. Notably, Plaintiff's employer indicated that these duties require "repetitive" use of both the right and left hand, specifically the movement of "simple grasping." (AR 403). This would presumably result from Plaintiff's computer usage.

### First Appeal Denial: Defendant switches rationale for denial of benefits

On October 2, 2008, Defendant switched its rationale for denying Plaintiffs benefits. Defendant stated: "We found that [Plaintiff's] cervical spine disease with myelopathy is not pre-existing under the policy, and does present with limitations; however those limitations do not prevent him from performing the material duties of his occupation." (AR 372). Most importantly, the letter stated,

On review of the medical record, and in speaking with Mr. Mills' physicians, Dr. Engelhardt found that as a result of his cervical disc disease with myelopathy, Mr. Mills would be expected to be physically limited from performing overhead work, reaching, lifting or carrying, pushing or pulling with the left arm and repetitive work using the left arm. She stated that he can use the left forearm for occasional light activities. She assigned no restrictions to the use of his left hand and/or right arm and hand, nor has Mr. Mills complained of any difficulty in these areas. While Mr. Mills has reported that he is unable to perform prolonged sitting or standing, Dr. Engelhardt did not find any support of his claim in the medical records. Moreover, Dr. Engelhardt stated "neck and arm pain would not be expected to result in limitations usually caused by conditions of the lumbar spine."

(AR 372). Defendant thus found that Plaintiff was not disabled. (AR pp. 368-74).

The Defendant's statement in the denial letter that Plaintiff has not "complained of any difficulty" in his "left hand" seems to derive only from the April 30th phone call. During several doctor visits, Plaintiff did in fact complain of pain in left hand. See, e.g., (AR 625)(reporting on February 20, 2008 in visit to Dr. Frere "pain and burning sensation...down to the finger tips on lateral aspect of his hand.); (reporting history of "tingling sensations in left hand and fingers" to Dr. Roberts on July 17, 2007). Dr. Engelhardt's report itself noted that Plaintiff reported symptoms of "pain and paresthesias into the left arm and hand."

Second Appeal and Present Status

Plaintiff's attorney appealed Defendant's new denial on November 18, 2008. The appeal letter cited Dr. Frere, and stated that Plaintiff is unable to meet several of the material duties of his regular occupation because he is unable to use his left upper extremity.

Defendant alleges in its briefing that Plaintiff again did not answer required questions for the appeal, only offering a letter from Dr. Frere. Def.'s Mot. at 6. This, however, is not accurate. Plaintiff's appeal did in fact answer these questions. The appeal letter, stated among other things:

The occupation of drafter requires bilateral manual dexterity, The *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* published by the US Department of Labor sets out that a drafter must be able to handle and finger objects frequently, Frequently is defined as an act to the performed between

one third up to two thirds of a workday, A drafter must also be able to occasionally reach, Occasionally is defined as up to one third of the workday, The occupation of drafter is considered a skilled occupation, The strength level required for this position is sedentary. Since Mr. Mills is restricted from using his left upper extremity, he cannot perform the bilateral manual activities of reaching, feeling and fingering that would be required of a drafter. Therefore he cannot perform several of the material duties of his regular occupation.

(AR 395).

On February 3, 2009, Defendant's Disability Appeals Committee denied Plaintiff's

second appeal, finding him again not disabled. (AR 364- 367). Defendant determined that

Plaintiff's condition did not prevent him from performing at least one of the material duties of his

regular occupation. The denial letter relied exclusively on the April 30th phone conversation. The

Committee stated,

> While your appeal stated that Mr. Mills is unable to perform the duties of drafter since he is unable to perform work activity with his left arm, Mr. Mills has stated that he can use his left arm and that it is not the source of his disabling condition. (AR 222). Rather, Mr. Mills states that he is unable to perform the occupation of drafter because he is unable to sit or stand for prolonged periods of time due to his arm and neck conditions. (AR 222). The Committee found no support in the record for Mr. Mills' statement that he is not able to sit or stand for prolonged periods of time. This information is not contained in the medical records and this limitation has not been provided by his physicians. Nonetheless, to the extent this limitation was present, Mr. Mills' occupation, as well as his job with the policy holder, would allow him to change positions at will, alleviating any need for prolonged sitting or standing.

(AR 367).

Plaintiff filed the instant action on May 10, 2010, and both parties motioned for Summary

Judgment on January 31, 2011. The parties also filed Responses and the Defendant filed a Reply.

## DISCUSSION

As the Defendant no longer contends that Plaintiff's ailments result from a preexisting

condition, the Court will not analyze this issue. The only issue before the Court is whether

Defendant abused its discretion in finding Plaintiff was not disabled.

The Court finds the Defendant abused its discretion in denying Plaintiff benefits, and grants Plaintiff's Motion for summary judgment.

It is undisputed that Plaintiff's occupation primarily requires computer usage. Plaintiff's employer stated that this duty requires both hands. (AR 403). There is extensive medical evidence is this case showing that Plaintiff's upper left arm is paralyzed, that his use of his left shoulder and forearm is limited, and that he suffers chronic pain. There is also evidence that Plaintiff suffers pain in his left hand.

Although Defendant has not a sliver of medical evidence countering these findings, Defendant has repeatedly ignored this evidence. In denying disability, Defendant instead relied on the notes of one of Defendant's employees regarding a brief phone conversation with Plaintiff. Essentially, the question in this case is whether these notes are sufficient for Defendant to reasonably find Plaintiff was not disabled. The Court finds this evidence was not sufficient to counter Plaintiff's previously reported symptoms, as well as the overwhelming medical in this case.

Standard of Review

A court should grant summary judgment if there are no genuine issue of material fact so that judgment is appropriate as a matter of law. Fed. R. Civ. P 56. On a motion for summary Judgment, a Court must view facts in a light most favorable to the non-moving party.

ERISA claims under § 1132(a)(1)(B) carry special review guidelines. When a plan provides a plan administrator discretionary authority to determine eligibility, courts must exercise "a deferential standard of review," determining only whether there has been an abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 115 (1989). Under this "abuse of discretion" standard, a plan administrator's decision is reasonable "if it is the result of a

deliberate, principled reasoning process and if it is supported by substantial evidence." Bernstein

v. Capitalcare, Inc., 70 F.3d 783, 788 (4th Cir. 1995). "Substantial evidence" is evidence which a

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v.

Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984). A court may only consider

evidence that was before the plan administrator at the time it made its decision. See, e.g., Stup v.

Unum Life Ins. Co. of Am., 390 F.3d 301, 307 (4th Cir. 2004). In this case, it is undisputed that

Defendant had discretionary authority under the Plan.

The Defendant's decision must be based on the whole record and Defendant cannot pick

and choose evidence that supports its decision while ignoring other relevant evidence in the

record. This principle was enunciated by the court in Myers v. Hercules, Inc., et. al., 253 F.3d 761

(4th Cir. 2001), where the court found that the administrator abused its discretion in "picking and

choosing" certain evidence from the record while ignoring other relevant evidence. The court

stated:

> Our review of the record, which we have just detailed, reveals that the process by which
> Provident reached its' decision to terminate Myers' LTD benefits was not reasoned and
> that its decision was not supported by the evidence. Provident reached its' decision only
> by misreading some evidence and by taking other bits of evidence out of context.
> Reasonably read, the evidence does not support Provident's conclusion that Myers could
> Work full-time at a sedentary job.

Id. at 768.

Additionally, The Fourth Circuit has crafted eight factors to guide courts in determining

whether an administrator has abused its discretion in denying benefits. Carden v. Aetna Life Ins.

Co., 559 F.3d 256, 261 (4th Cir 2009) citing Booth v. Wal-Mart Stores, Inc. Associates Health &

Welfare Plan, 201 F.3d 335 (4th Cir.2000). The eight factors are: (1) The language of the plan;

(2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the

decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; (8) any conflict of interest. The consideration of these factors is not mandatory; instead a court "may" consider them. Booth, 201 f. 3d at 342. Courts utilizing these factors often only consider some of these factors. See, e.g., Carden, 559 f. 3d 256 (only analyzing factors 1, 2, 4 and 8).

A conflict of interest exists when the plan administrator is also the plan insurer, meaning the same entity decides whether an employee is eligible for benefits, as well as pays benefits out of its own pocket. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008.) "The significance of this factor will depend upon the circumstances of the particular case." Id. Here, it is stipulated that the Defendant is both the Plan administrator and insurer. The Court thus considers Defendant's conflict of interest.

Several other Booth factors guide the Court's analysis, including factor one, the language of the Plan; factor three, the adequacy of the materials considered to make the decision and the degree to which they support it; factor four, whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan; and factor five, whether the decision making process was reasoned and principled. Each of these factors resolve in the Plaintiff's favor.

### Factor One: The Language of the Plan

The language of the Plan sets the parameters for the Court's inquiry.

Defendant's Plan provides the "Occupation Test" to determine disability. This test requires that "during the first 24 months of a period of disability," an injury or disease "requires [the claimant] to be under the regular care and attendance of a doctor, and prevents [the claimant] from performing at least one of the material duties of [his] regular occupation."

Here, it is disputed whether Plaintiff's occupation is correctly defined as that of a Drafter or Engineer. Regardless, it is not disputed that Plaintiff's primary duty is computer use. It is also undisputed that this use requires both hands. See, e.g., (AR 119, 403). Thus the only relevant inquiry is whether Plaintiff's ailments allow him to perform this material duty.

<u>Factor Three: The adequacy of the materials considered to make the decision and the</u>

<u>degree to which they support it</u>

Defendant's finding that Plaintiff's ailments allowed him to perform his computer was not supported by adequate materials.

The Supreme Court has rejected the "treating physician rule" in ERISA cases: "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003). However, the Defendant's decision must be based on the whole record and Defendant cannot pick and choose evidence that supports its decision while ignoring other relevant evidence in the record. <u>Myers,</u> *253* F.3d at 768.

Here, after Defendant determined that Plaintiff's condition was not in fact pre-existing, Defendant reversed course and twice found on appeal that Plaintiff was not disabled under the Plan. On October 2, 2008, Defendant sent Plaintiff a letter detailing its decision on Plaintiff's

first appeal. Defendant stated: "We found that [Plaintiff's] cervical spine disease with myelopathy is not pre-existing under the policy, and does present with limitations; however those limitations do not prevent him from performing the material duties of his occupation." (AR 372). The letter stated, in pertinent part,

On review of the medical record, and in speaking with Mr. Mills' physicians, Dr. Engelhardt found that as a result of his cervical disc disease with myelopathy, Mr. Mills would be expected to be physically limited from performing overhead work, reaching, lifting or carrying, pushing or pulling with the left arm and repetitive work using the left arm. She stated that he can use the left forearm for occasional light activities. She assigned no restrictions to the use of his left hand and/or right arm and hand, nor has Mr. Mills complained of any difficulty in these areas. While Mr. Mills has reported that he is unable to perform prolonged sitting or standing, Dr. Engelhardt did not find any support of his claim in the medical records. Moreover, Dr. Engelhardt stated "neck and arm pain would not be expected to result in limitations usually caused by conditions of the lumbar spine.

Defendant's denial of Plaintiff second appeal stated,

While your appeal stated that Mr. Mills is unable to perform the duties of drafter since he is unable to perform work activity with his left arm, Mr. Mills has stated that he can use his left arm and that it is not the source of his disabling condition. (AR 222). Rather, Mr. Mills states that he is unable to perform the occupation of drafter because he is unable to sit or stand for prolonged periods of time due to his arm and neck conditions. (AR 222). The Committee found no support in the record for Mr. Mills' statement that he is not able to sit or stand for prolonged periods of time.

According to Defendant's first letter, Defendant's conclusion that Plaintiff's disease did not interfere with his occupation derived from two sources: Dr. Engelhardt's analysis and the April 30th phone call. The denial letter of the second appeal is only based on the April 30th phone call. Defendant's interpretation of this evidence however, is not supported by the record. The vast weight the Defendant gives the April 30th is also inappropriate.

First, Defendant's statement that Dr. Engelhardt placed "no restrictions" on Plaintiff's hand is misleading. (AR 372). Dr. Engelhardt did not explicitly state that Plaintiff's left hand was unrestricted; instead she merely did not address the limitations of his left hand. Indeed, at the

20

time of Dr. Engelhardt's report, she was not aware of Plaintiff's job duties, and thus could not make a determination of disability. (AR 423). It is only reasonable that her restrictions of his left upper arm and forearm would also encompass Plaintiff' left hand, and preclude him from repetitive use of his left hand for computer work.

The first appeal denial letter also states that Plaintiff has not "complained any of any difficulty" in his left hand. This declaration seems to derive only from the April 30th phone call. During several doctor visits on the record, Plaintiff did in fact complain of pain in left hand. See, e.g., (AR 625)(reporting on February 20, 2008 in visit to Dr. Frere "pain and burning sensation...down to the finger tips on lateral aspect of his hand.); (reporting history of "tingling sensations in left hand and fingers" to Dr. Roberts on July 17, 2007). Dr. Engelhardt's report itself noted that Plaintiff reported symptoms of "pain and paresthesias into the left arm and hand." (AR 420). Dr. Engelhardt also noted treating physician Dr. Frere's conclusion that Defendant's condition was completely disabling and Plaintiff "could never do data entry." Id. ; Also see, (AR 495, 737, 782). Defendant's clinical disability special, RN Barb Walls also noted on January 15, 2008 that Plaintiff "is unable to sustain activities of standing, sitting, data entry, and grasping due to the muscle atrophy and pain." (AR 119). Nurse Walls repeated this conclusion on February 7, 2008. (AR 118).

The vast weight that the Defendant gives the April 30th phone call is inappropriate. Indeed, the second appeal denial letter was only based on this call. Defendant's knowledge of this phone call is solely derived from Defendant's employee's notes. (AR 222). First, it is difficult to derive Plaintiff's exact words from these notes, as well as the context for the words. Id. More importantly, these brief and casual comments contradict Plaintiff's prior statements and overwhelming medical evidence showing Plaintiff's upper left arm is paralyzed, and that his

forearm and left hand experience chronic pain. Defendant's denial letters did not discuss this evidence, nor has Defendant countered this evidence with other medical evidence.

Defendant thus failed to base its decision on the whole record, instead "picking and choosing" certain evidence from the record while ignoring other relevant evidence. Myers, 253 at 768. For the same reasons, the Court also finds the decision was not reasoned and principled under factor five.

### Factor Four: Whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan

Defendant's interpretation was also inconsistent with its earlier conclusions that Defendant was disabled, as well as earlier interpretations of the long term disability plan. Defendant determined that Plaintiff's disability qualified for short term disability. Subsequently, Defendant denied Plaintiff for benefits finding his condition was pre-existing. Indeed, at this time, two of Defendant's employees concluded that Plaintiff was otherwise disabled, under the Plan's definition. Defendant denied the existence of a disability only after Defendant could not support its conclusion that Plaintiff had a pre-existing condition.

Defendant approved Plaintiff for short term disability benefits on January 8, 2008. (AR 142). Subsequently, Defendant's clinical disability special, Registered Nurse Barb Walls, made multiple determinations that Plaintiff was disabled. On January 11th, Nurse Walls stated that Plaintiff's return to work "is unlikely without the use of his left arm due to the progressive nature of the muscle atrophy and the multiple locations of spinal involvement." (AR 114). Ms. Walls concluded "it is reasonable that Mr. Mills is unable to sustain any activities of his job due to the inability to use his left arm for work activity." (AR 114). Four days later, RN Walls completed another assessment of Plaintiff. She noted that "[alt]hough Mr. Mills' job is sedentary, he requires sustained use of both arms to do his work activities." (AR 119). She concluded that

Plaintiff "is unable to sustain activities of standing, sitting, data entry, and grasping due to the muscle atrophy and pain." (AR 119). On January 30, 2008, RN Walls completed a third assessment. She concluded that "it is reasonable that Mr. Mills remain off of work until after his next appointment with Dr. Frere on February 7, 2008. He remains unable to sustain activities of standing, sitting, data entry and grasping due to the muscle atrophy and pain." (AR 118).

Defendant's Technical Consultant, Scott Uptgraft, DC III, also found Plaintiff to be disabled under the Plan. On May 30th, he wrote, "[a] review of the file shows that we were in agreement with limitation from all work during the STD [short term disability] period, which ran through 4/24/09." (AR 216). Uptgraft concluded, "At this time, without such additional information, we would still consider the insured to remain disabled as per the occupation test. Id. Notably, Uptgraft came to this conclusion even after considering Plaintiff's April 30th phone call. Uptgraft ultimately recommended denying Plaintiff's claim because of Dr. Smith's conclusion that it was a pre-existing condition.

Defendant only found Plaintiff disabled after Defendant's consulting physician, Dr. Engelhardt, found Plaintiff's condition to not be pre-existing on appeal. Yet no new evidence was before Defendant allowing a denial of disability. The only new medical evidence was Dr. Engelhardt's analysis, and Dr. Engelhardt concluded she did not know enough about Plaintiff's occupation to determine disability under the Plan.

Thus Defendant's conclusion that Plaintiff was not disabled is a departure from its earlier findings of Plaintiff's disability. Additionally, no new evidence excuses this departure. For the same reasons, the Court also finds the decision was not reasoned and principled under factor five.

Factor Eight: The fiduciary's motives and any conflict of interest it may have.

The Court finds Defendant was influenced by its conflict of interest.

A conflict of interest exists when the plan administrator is also the plan insurer, meaning the same entity decides whether an employee is eligible for benefits, as well as pays benefits out of its own pocket. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008.) "The significance of this factor will depend upon the circumstances of the particular case." Id.

Here, Defendant's conflict of interest is undisputed. The Court also finds that this conflict of interest played a role in denying Plaintiff's benefits. The evidence shows that Defendant was determined not to pay Plaintiff long term disability benefits. First, it denied Plaintiff's benefits for a pre-existing condition. When it learned that Plaintiff's disability was not in fact preexisting, it ignored the overwhelming weight of evidence, to find no disability.

Oftentimes, ERISA cases involve battles of the experts or determinations of Plaintiff and witness credibility. Here, none of these analyses come into play. Instead, Defendant simply based its conclusions on insubstantial evidence, swayed by its conflict of interest.

## CONCLUSION

Plaintiff's Motion for Summary Judgment is GRANTED. His claim for Long Term Disability benefits is supported by compelling evidence, and Defendant abused its discretion by denying benefits. Defendant is obligated to pay Plaintiff back benefits as determined under the Policy from April 25, 2008, to the date of judgment with pre-judgment interest. Defendant is also obligated under the terms of the Plan to continue to pay for Plaintiff's income benefits for as long

as he remains eligible.

The Court also exercises its discretion to find that Plaintiff is entitled to reasonable costs and attorney fees pursuant to 29 U.S.C. § 1132(g)(1). Plaintiff is ORDERED to file a brief in support of its claim for fees.

SO ORDERED, this ___22___ day of May, 2011.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE